Cambridge Christian School v. Florida High School Athletic Association Stephanie Varela on behalf of Cambridge Christian School and with me at Council's table is Hiram Sasser. Rarely does the government flatly admit it is engaging in viewpoint discrimination, but that is precisely the case before you today. Can I ask you a quick question before we get going too far? The briefs that you have submitted are overwhelmingly about viewpoint discrimination. The District Court found that this was government speech and therefore that the First Amendment didn't apply. I'll just tell you, I think you have come perilously close to having waived arguments about government speech which would be dispositive against your position. You've got a couple of bulky footnotes addressing government speech and then some sort of later discussion of it in an Establishment Clause portion of your brief. Can you explain to us why, without divulging client confidences of course, but why you briefed the case the way you did and why I feel so now uncomfortable about the position that you really haven't taken with respect to the dispositive question in the District Court? Sure. As I have read the record, government speech really did not become an issue until the hearing on the motion to dismiss. But I mean the District Court's order is littered with it, right? That's the basis upon which it was. The District Court's order which had the benefit of the briefing that had occurred up until that point and then the magistrate's report and recommendation. But government speech really did not come up until our hearing. It has always been our position because at the outset the reason that we were given was the denial of our request was based on viewpoint that this has been a viewpoint discrimination case. But if it's government speech, the government can discriminate on the basis of viewpoint in its own speech, correct? If we're in government speech land, we are outside First Amendment land. Sure. But this is not – it's not our position obviously that this is government speech and our entire briefing on appeal represents a complete repudiation of that notion. Sub silentio, right? I mean – or very nearly sub silentio. I mean the District Court wrote an order that said you lose because this is government speech and you don't really push back on that except by implication by arguing 50 pages about viewpoint discrimination. Well, I think the way that we approached it is we win because this is private speech and the state engaged – Right. But you see at the outset the threshold question becomes whether or not this speech was government speech at the outset. Did they control the microphone and call the tune in such a way that they had a right to exclude you, that there's no free speech issue at all because it was government speech? That may be wrong but at the heart of your argument it seems to me and what Judge Newsom is saying is you've got to say this is not government speech because and therefore there are First Amendment dimensions to the problem because if they're right that this is government speech, you lose QED end of story right at the outset. Sure, and I understand the court's concern. However, as I – So why don't you tell us why this isn't government speech? Sure. When I say this, my reference is to that introductory portion of the football game when by their allegiance and they said no, we're not going to let you say a prayer at the beginning. Sure, and if I could just step back for just one second, it's important to remember I think that whenever we're characterizing or thinking about characterizing speech as government speech, courts are generally reluctant to do so because it strips speech of all its protections. At the outset of this litigation, even before litigation actually began, let's be clear. We requested the loudspeaker to pray and the government said no, you can't pray because we're afraid that it will legally entangle us and – We understand their rationale was that they thought it would put them in violation of the establishment clause. It was the nature of the speech itself that led Neuer to say you can't do it. I understand that, but I want to go to the threshold question that Judge Newsom is raising. Why isn't this government speech? It's not government speech because under case law like Johan, for it to be government speech, the state has to control every word that is disseminated. I'm sorry. I have to stop you about this because when I read your citation and quotation of Johan in your brief, I was so surprised that I thought could Johan really say that? At pages 26 of your blue brief, page 3 of your gray brief, you quote Johan as saying speech constitutes government speech only when, quote, the government sets the overall message to be communicated and approves every word that is disseminated, close quote. So when I read that, I thought holy cow, that's pretty strong stuff. Let's check out Johan's. Johan says when as here the government sets the overall message to be communicated and approves every word that is disseminated, it is in effect government speech. That states a sufficient condition, not a necessary condition. You have inserted the word only with respect to Johan's observation that fundamentally changes the meaning of that passage. I think that if you take a look at all the cases that we have cited for government speech, it's certainly true that there's a high degree of control over that speech for it to be government speech. When you're looking at government speech cases, you're looking at the degree of control over the communication that's being expressed. I agree that control is one of three factors that has been recognized in Summum and the license plate case, Walker, and in our math tutor porn star case, whatever the name of that case was. I can't quite remember. Mech. But your characterization in your brief and then again today that government speech analysis applies only where the government controls every word I don't think is a fair reading of the balance of the precedent. There are messages of course that are communicated in any given platform that can be government speech and that can be private speech. The fingerprints that are over the message, if that comes from the state, that's government speech. That's what these cases represent. It's again, not to sound repetitive, but it's the degree of control. What guides the analysis here is if speech is controlled by the government, that sends off a signal to the public that is different from private speech. Let me ask you the question this way. Suppose the state authorities had said to the request to give a prayer at the outset, thank you, the answer is no. This is government speech at the outset and we don't turn the microphone over to anybody for anything. We do two things. We do the pledge. We do the national anthem. That's traditional at the start of a football game. That's it. Thank you very much. We don't care what your message is. We're not giving you our microphone. That would classically be government speech, right? I think the reason for- Would that be classically government speech? I would disagree with that. You mean they are obliged to give you the microphone? Under the protocols and the policies, which again were not relied on by the state at the outset of this litigation but which are part of the record, the parameters that are set forth by the protocols and the procedures allow the school to communicate to the public. The protocol itself says, and I can read it to you just so that you can see, on record page 8-1, page 15, messages provided by host school management is something that can be disseminated by the private Christian school that's invited- Okay. Let me ask the question this way. Suppose the protocol simply said, we're not turning the microphone over at the outset of the game. Period. End of story. The only message will be our message, and what we're doing is the Pledge of Allegiance and national anthem. QED. End of story. Thank you very much. That is closer to government speech. Closer? How could it be anything but government speech? Well, okay. I'm sorry. That is government speech. However, if the motivation behind that decision is to suppress a particular viewpoint, because now we've already said we want to pray. If their point is to suppress viewpoint, if the evidence shows we're digging all this up and the record shows, wait a second, there's a reason why they said that, then we can get into- Well, suppose the government just doesn't want to have ... They're going to make it government speech because they don't want other speech, including protected speech. Right. But the forum is closed. It's a government forum, period. If it's a government forum, period, then it doesn't make any difference who they would let in or not let in, or viewpoint, or anything else. Do you agree with that? Yes, I do. But that's not what happened here. Well, what concerns me about the high schools, the Athletic Association problem, is if you take all of the evidence together, including what happened at halftime, it was not a closed government speech forum. Right. It was open. Right. The inference, more on summary judgment, it's inferrable- Motion to dismiss, Your Honor. ... that it was always open, notwithstanding what they said. Well, here's the thing that we have to remember- Except that it wasn't going to be open to that particular viewpoint, religious viewpoint. Here's the important point about this. Remember, these are two private Christian schools that were invited into Camping Stadium World to go ahead and play at this game. The private actors wanted to, requested the loudspeaker to use, briefly, as they're allowed to do, private speech is allowed. We have various instances- You keep saying that private speech is allowed. Is it because of that one line in the protocol? No, it's not- Hold on, hold on one second. I mean, isn't the purpose of the PA system, which I'll take to be, I don't want to say forum because that's loaded with all kinds of First Amendment baggage, but the medium. I mean, isn't the purpose of the medium to administer a football game, right? I mean, like Johnny coming on the tackle, completed pass for 13 yards, so-and-so, your lights are on, little Johnny, you've lost your parents, meet them at the press box. Sure, but the private schools were invited to go ahead and use the loudspeaker for certain things, and keep in mind that before- What were they allowed to do? Can we tell from the, I'm not sure I can tell from the complaint, what it was they were allowed to do. I understood that they were allowed to make some kind of message, but I don't know what the message was, and they were allowed to put on a halftime show of seven and a half minutes. Right. And that's the beginning and the end of what they were allowed, at least by the protocol. Do we know what message they were allowing? Can we tell that from anything that is before us on a 12v6 motion? Based on the allegations that we pled, before, during, and after the game, there were advertisements, announcements, promotions- No, no, I know there was commercial speech. All around. That's not the focus of my question. I know the announcer gave some kind of commercial speech message, Bob's Brewery, come down, have a hamburger and a brew after the game, whatever it was. Several. That's not my question. My question is focusing on the portion of the protocol that deals with messages. Yes. Do we know what kind of messages fall within the ambit of that? Well, one example- Can I tell from the record? Yes. One example from the record. The only record I have is the complaint. So point me where in the complaint I get an answer to that. In the complaint, what we point to are, again, what I had just pointed out to you, and also the halftime show. I'm not asking about the halftime show. No, I understand. I'm just saying what we pointed out into the complaint. What the record shows, in addition to that, is that at 8-2, page 22, the school representatives from each school can make- I'm sorry. Are we talking about the complaint now? No, no, no. This is- Well, actually, this would be part of the amended complaint. It's one of the attachments to the amended complaint. So it would be- And what would that amended complaint- Is that exhibit A? It's 8-2. What is it? What document is it? Okay, it's- I'll tell you right now. Give me a second. One second. And I thought I had the word- Oh, here. I'm sorry. Oh, here it is. Okay. Sorry about that. That's okay. 8-2, 22, it says, school representatives from each school will make a public announcement informing the crowd to stay off the field of play and warn of the consequences. The two-minute warning will be- But it's in exhibit A. Is that right? That's where you're reading from? Yes. Okay. Let me just confirm that for you. But does exhibit A tell us what falls within the ambit of message? What falls within, yes. That's the- What exactly does it say about a message? Sure. What it says about the message is- You're talking about specifically the protocol? Yeah. Yes. So it says, the announcer will follow the FHSAA script for promotion announcements, which are available from the association. Other announcements are limited to messages provided by host school management. And- And- If I can make just one- Yeah, yeah, yeah. Please go ahead. I'm sorry. There's no indication in this record that the PA system is only available to the announcers. No, no, I understand. The problem- Right. Candidly speaking for myself, the problem that I have is I can't tell enough from the complaint. And maybe it's a little quick to drill it dead on 12b6 when critical facts and discovery may help me. Right. What do I know about the message from the host school management? Is there any explication of what that means in Exhibit A? Well, we- I think the answer is no. It's just a very simple question. Does that tell me what kind of message I might be able to give? I mean, I would disagree with that, Your Honor, respectfully. I'm asking, does it tell me the kind of message?  What does it tell me about the kind of message? The different messages that were displayed both before, during, and after. We have the banners- But does Exhibit A say that? I'm sorry? Does Exhibit A tell me what the message is? No, no. Exhibit A- That's all I'm asking. Exhibit A is the procedures, right? I understand. So I won't find an answer to the kind of message by looking at Exhibit A. All it says is what I read, which is the messages by the host school management. And Exhibit A, again, is- I can find it for myself. But what is that? It's a procedures something. Yeah, it's the procedures. And what was the thing that you read about no field storming? That's the way I heard it. As an Alabama fan, having suffered through Auburn storming the field with the kick six, I remember- I know all about field storming. Right. So that's one example that's in the record. It wasn't specifically pled, but it is in the record. It was part of the attachment to the complaint that conveys an example of where, again, the PA system is out of the control of the state. It's being given to the private Christian school who's participating in the event to disseminate messages. The point about all of this is that the government is not in full control the entire time of all these different messages. And that's okay because for two reasons. Number one, it has created, as Judge Joe Flatt mentioned, a limited public forum. Limited or non-public forum? Even in a non-public forum- I'm just trying to figure out because I actually think that you've walked away from your limited public forum argument. I don't think you've argued it in your brief. I think we did, Your Honor. Our point is that it doesn't really matter because viewpoint discrimination is never- Right. I agree with you about that. Yeah. And, again, religious speech is a protected viewpoint. So we have to go back to the reason why this was denied to begin with. The reason why it was denied, before anything happened, before any case papers were filed, was we asked to pray and they said, no, that's prayer. We can't entangle ourselves. That's wrong. That's the conduct that's in violation here. You can't do that. Can I ask you a quick question to get to Judge Marcus's very important question about what we know from the complaint and now Exhibit A? So the protocol itself says messages from the school management. Yes. And then Exhibit A, you said, provides us some semblance of understanding of what sorts of messages we're talking about. When it's not the state that has the mic, but now it's the private school that has the mic. Is that right? You said one example of that kind of message is no field storming. Right. Well, that's one example that I found in the record. But, really, the record doesn't illuminate that. We have what the policy says. So it seems to me, Counselor, what you ought to be saying is we don't know. We're entitled to learn. Therefore, we ought to go forward on discovery. Period. End of story. That seems to me to be the way to argue it. That's part of it, too. But, you know, we did plead what we pled what we pled. Let me ask you a different question. We're over the time, but it's an interesting case. Let's talk about the free exercise claim that you made, not the free speech claim. No, I understand. To plead a claim for violation of the free exercise clause, it is clear that you've got to allege that the government has impermissibly burdened one of its sincerely held religious beliefs. Those are kind of the buzz words. We've read that to mean that, one, the plaintiff has to show that he holds a belief, not a preference, a belief that is sincerely held and religious in nature, not merely secular, and, two, that the law at issue in some ways, some meaningful ways, impacts the plaintiff's ability to either hold that belief or to act pursuant to that belief. The problem that I had when I looked at the way the complaint was alleged, and I'm talking really not about the complaint, but I'm talking about the amended complaint, the operative complaint here, is it didn't seem to me that you said, although you may have said it in other words, you didn't say that communal speech over a PA system at a football game is part of our sincerely held religious beliefs. It came close. You said we pray at all kinds of functions. We pray at the school at the start of the day. We pray at lunch. We pray at events of all kinds of different character. But nowhere do you allege in the complaint, I think, that it is a sincerely held religious belief that when we have a function of this kind where we're in a football stadium, that we should be praying in a communal way, fans, team, everyone, over a PA microphone. Do you say that? I believe that. Because I don't think you used the words sincerely held religious belief. If you do, point it out to me. Well, I'd like to call your attention to paragraphs 18 and 19 of the amended complaint. Sure. That would be 8, page 5 of the record. And also, the actual account. You say 18, using a loudspeaker is important to Cambridge Christian tradition of prayer. I understand that. I'm just asking whether you've actually used the words sincerely held religious belief that we've been permitted to use a PA system at a football game. That may be the import of what you're saying, but I don't know that you said it quite so simply and directly. If you look at the accounts, I believe we have that. So I'm looking at, for example, let me point you to a sooner one, but I see it on paragraph 125. But 19 doesn't do it for you either, at least in the sense that I'm talking about. I think that if you look at the actual accounts themselves, we have that language, Your Honor. Okay, just point me to the— For example, is paragraph 124. I understand that's for the state claim. I'm looking for the federal claims. I believe we have that in the federal claims as well. So paragraph 88, for example, the policy and position taken by the state has substantially burdened and adversely affected Cambridge Christian's religious exercise and freedom of speech. Yeah, that's stated, again, at a very high order of abstraction. Obviously, you're going to have to plead that it affects your right to free exercise and your right to free speech. But do you say in words or substance it is a sincerely held religious belief that we be permitted to pray in a communal way at a football game using a PA system? I think if you— Trust me, the answer is in that simple form you don't say it. I believe that it can at the very least be reasonably inferred, and there are— Tell me why. Because we spend—we explain how prayer, communal prayer, is integral to the school's mission. We make the claims of a violation of free exercise clause, which requires that component, and we seek for declaratory relief of those same violations. In addition to that, we explain that the fans themselves who are part of the community were deprived of the ability to engage in that communal prayer. That's part of their faith base. And I don't think that the case law supports the government telling people how they should engage in prayer. And so I do think that the allegations reasonably support that position. So you can reasonably infer it even if you didn't use the buzzwords? If we didn't use it, I'll double-check now, but I— You didn't use the buzzwords. It's a sincerely held religious belief is that we pray communally at a football game, and the only way to do it is with a PA system because, after all, how could you do it in the Citrus Bowl without a PA system? We explained that we needed the system so that everyone can hear us, yeah. And I do believe that the counts suggest that, yes, or allege that, yes, it's a sincerely held belief based on paragraphs like 18 and 19 and also other pages. I mean we have two pages where we explain, where we allege that communal prayer is part of our faith-based system. What you say is part of your tradition. I think it's— But it's not quite the same thing. You understand why I'm dwelling on the question? I do. And your answer to me may be, well, even if that's right, Judge Marcus, we ought to be given leave to amend. It would be easy enough to say it. Sure, absolutely. Just to direct you to those allegations, they're on pages four and five of the complaint. Thank you. Thank you. You saved some time for rebuttal. Thank you. Ms. Mercier. May it please the Court, Judith Mercier on behalf of the Florida High School Athletic Association. There's at least two separate threshold issues that we believe are fatal to this appeal, and the first one being government speech. And as your Honor, Judge Newsom raised also, they didn't preserve their position on government speech. Well, they sure put it in a long footnote. Right, and under the Eleventh Circuit precedent, we don't believe that's— I mean, I didn't have to hunt for Red October to find a Russian sub in the Pacific Ocean to know that they were telling me this was not commercial speech. They may not have said it clearly, but they certainly suggested it in the footnote, didn't they? Absolutely. One footnote. Then footnote 20. And the district court certainly took it that way, right? The district court had no trouble going right to the heart of the commercial speech issue. Correct. So it was briefed. It was addressed in the district court. It was of a fashion raised here. I don't know that you could say that. They really abandoned that question when it seemed so central. We do believe the issue of government speech is a threshold issue that they cannot address. Absolutely. And even if it wasn't government speech, the fact that it's a non-public forum is another basis for it. I want to talk about the government speech and the control and what we're talking about here. Let me stop and ask you just a preliminary question about government speech. We all agree under controlling law, if it's government speech, they lose, period. They can knock them out. Whether or not it's government speech is another question. The Supreme Court has suggested and we've said that the precise test for separating government speech from private speech may not be all that easy sometimes, but we look at at least three things. We look at history. We look at endorsement. We look at control. They overlap, but those to the extent we can break out different things we look at. Let's start with history. Can we tell from this record simply from the four corners of this complaint and the attachments what the history is? What happened in the past? No, and there's no allegations about that. Well, so we can't answer that question, but we do know a couple of things about history from the complaint, right? We know they allege specifically that in the past they were actually able to pray at a football game. They allege in paragraph 38 that representatives of Cambridge and Christian and University Christian asked to use the loudspeaker. University Christian also explained that before the 2012 state championship game, which was also administered by the association, University Christian and Dade Christian prayed over a stadium loudspeaker. So we do know historically if you accept that as true and we would be obliged to accept that as true, would we not? Correct. There's one instance. Well, okay, and we know something else as well. We know, do we not, that they prayed at two semifinal games, right? They tell us that in the complaint. Trust me, it's in there. I trust you. Now, I take it it was a game at probably a home game on their own field, and I don't know what the FHASAA said about that, but presumably they had some control over it because it was one of these semifinal games. I can't tell that. So I can't tell much about the history here, right? And that's not dispositive because you have the other two. You'll see where I'm going with my question. And we know as well here from the complaint that when they asked for permission, they were rejected, and they were rejected specifically on account of the nature of the speech itself. No religious prayer. No religious speech. Why? Why? Because we're worried that we'll run afoul of the Establishment Clause. You obviously talked to your lawyers. They said, look at Santa Fe. We're going to run afoul of the Establishment Clause. We're not going to let you do that. Do we know or can we tell historically whether anyone else ever sought the opportunity to make a message on the front end and was denied it where the message wasn't religious in nature? No, there's no record on that. That's right. I understand that there's no record on that. So we don't know if other prefatory messages were ever tried and rejected or if they were tried, whether they would have been rejected. Are there any allegations about that? I do understand that as well. Then we come to the question of control. Would the FHSAA allow a different nonreligious message to be delivered at the outset of the game? No. And from that, if you look at the protocol and you look at the script. I mean suppose, for example, two private schools wanted to thank their alumni for financing the football team, without which they just couldn't field a football team. No, the PA system is not. Well, I'm just simply, do we know, can we tell from this record whether if they said, we just want to say thanks to our alums for financing football? Well, what you can tell is by the protocol, which says the announcements are limited to this. And it's very important. Well, but the protocol speaks to a message from the host school manager, right? Provided by the host school, which means the PA announcer is going to announce it. So, you know, whoever the host school is, host school, welcome to the Division II-A championship game. Curiously, and what's not in the record, is that their request for prayer, if they had that right, if they had the right to take over the microphone, they wouldn't have had to ask. They would have just taken the microphone and the message provided by the host school and given prayer. They didn't do that because they knew that's not allowed. If you look at the protocol, which says message provided by the host school. Does that mean, counsel, that if I wrote out a message that said, I want to thank the alums for contributing financially to the football program, and I wrote out the script in a paragraph, maybe I even identified some of the big funders, it would be read verbatim by the PA announcer? No, it goes through the filter of the PA announcer, who has to maintain neutrality at all times. It's different than if the policy said both schools can do whatever message they want at the beginning. If that was the case, if that were the policy, which it's not, then the schools could give whatever message they want. Do you agree for purposes of 12b-6 that in trying to suss out what message provided by the host school management means, we look through to exhibit A, whatever the document is that we were... Right, and consider the difference between that language and the other... But what does exhibit A tell me about that? See, that's the problem that I was having. It doesn't look to me like exhibit A informs the meaning of message that a host school manager might provide to the PA announcer. Right, but it's in the context of what the public address protocol is, and if you read it in context, the only reasonable reading of it is that everything is going through the PA announcer. Now contrast that with the other section, which was in 8-2, and that is at... It's document 8-2, page 42 of the lower court's record, and page 191 of... Hold on. The... I seem to have missed it, but the language for the don't storm the field, it specifically says that members of each school will say this. So it is controlling what's going to be said. That language is completely different than a message provided by... Let me ask you a question this way. When you come to halftime, is that government speech too? It is. The government doesn't give up control for the halftime show. There's a performance, and what the association... How is that then? How is it government speech if you turn to two football teams and you say to them, traditionally we understand halftime, what it is, we have music, maybe we have some dance, it's an interlude between the first and second half, and you go put on the show, you give us the music, and we'll pipe the music in through a public address system, and the cheerleaders will dance to the music. Is that government speech? Well, it doesn't change the nature of it because, yes, it is control. The cheerleaders couldn't, first of all, without... You mean just because it's on a... Is it just because it's on a public address system? Is that what makes it government speech? No, it's the aspect of control. The cheerleaders could not... What's the control? The reason I ask the question is do you tell them what they can and can't put into their halftime show, and if so, is there anything in the protocol that says that? It just says you've got seven minutes. For their performance, and I believe, I think it says performance. I can tell, well, the... Going back and forth because it has never happened. There's no record of it, but if the cheerleaders took over the microphone and said, we're going to give a prayer, we're not going to do a performance, we're not going to dance, we're just going to give a prayer, that wouldn't be allowed. How do you know? Where does it say that? You have to read the context. Well, I have read the context. Okay, and you read the script of the... The reason I say it is it seems to me that what you've done is you've said what usually happens at a football game. We expect there will be a halftime show that the teams will perform, that certainly in a college you'd have big bands and stuff like that, but in high school they can't afford that. So they give you the music. Suppose they give you religious music and they dance to religious music and religious songs. Is there anything in this record that suggests you censor that and bar that from doing it? There's nothing in the record that says... It certainly looks in many ways to be some kind of private speech, some kind of private message. If I'm sitting in the stands and I'm watching a football game and the two teams get seven minutes each to perform at halftime, am I going to look at that and take that to say that it's got the imprimatur of the state on it? That's state speech? Is that how a normal sentient human being sitting at a football game is going to take a halftime show? I don't know that a normal person would take that. I think there's a difference, though, in the nature of... But you see, you say halftime show is government speech. The Supreme Court tells us we've got to look at history, control, and endorsement. I have no evidence on any of that here. All I know is you give them seven minutes. They give you the music. You play the music. They dance. That's it. Don't tell me whether you can censor the message if you don't want it. Suppose they wanted to give you a political message. Would you censor that? I don't know. I bet you would. But I don't have anything in the record that says it. But suppose the music is religious music to which they are dancing. Christian networks, there's Christian rock music. But they speak to Jesus. Is there anything here that says they can't do that? No, and I don't think it changes the nature of the control. Why doesn't it change the nature of the control if the school gets to decide what music to dance to rather than... Let me just finish. Of course. That the school gets to decide what music to play unreviewed and uncensored by the state. Why isn't that private speech? What makes that government speech other than that it's on a government platform through a government vehicle, the PA system? I do think the difference is the control over it. And it's... But I guess Marcus is saying that as to the cheerleading, as to the halftime episode, there is no control so far as we know. Other than giving a seven. There's control. You say you've got seven minutes. You can dance and give us music. It directs what the performance can be. Let me throw something out for you. The Athletics Association knows that these are two Christian schools. And that's inferable from the complaint. It's not known, alleged. Number two, they know that they've been praying before games. So they know who the audience is and who the teams are and what their religious beliefs are. And they allow... And they turn the microphone over for halftime. Picking up on what Judge Marcus was saying. They could anticipate most anything religious at the halftime. Either explicitly or by inference or whatever. A story. I have a hard time under those circumstances. Since they have no idea of what's going to be done at halftime with these schools. Saying that the complaint shows as a matter of law that this is government speech at the halftime. I understand your point. I do think the issue of control is different here. But even if... We're talking about a dismissed verified complaint now. Right. Which they were given the opportunity to amend and they did not. Right. But isn't it fair to say that we just don't know? We can't tell. And so the real question is whether the complaint states a claim plausibly under Iqbal and Twombly. Is there a plausible theory upon which they can travel? And if the answer is yes, then maybe the district court was just a little too quick on the trigger. To dump the case on 12B6 rather than giving them the opportunity for discovery. And you may be right that it's government speech. But it certainly isn't self-evident from the four corners of the complaint and the attachment, is it? I believe... I'm talking about at halftime. See, you can make a stronger argument, it seems to me, on the front end than at halftime. And maybe the contexts are different then. I don't know. Right. Well, I do think it's different. And I do think on the complaint, the allegations, and what has been submitted, that there is enough to find government speech. At halftime? At halftime. Right. For the reasons I've set forth. Just so I'm clear, is it your position that looking at the halftime episode alone, that that is government speech? Or that holistically this thing, the PA medium, is government speech? And the fact that halftime may not be controlled rigorously, as rigorously as everything else, is not sufficient to sort of overcome everything else that's going on? A second, Your Honor, is you have to look at the thing in a whole. And it can't be because there's no allegations and nothing in the record that the PA system is turned over to bands. What happens is if it's cheerleaders and they don't have a band, the reason they use the PA system is for music. It can't be that if a school doesn't have a band and they have a cheerleader, they get to pray. The problem is, though, the problem is that there's nothing here that tells me that there's any state sensorial involvement in the selection of the music or the choreography of the cheerleaders. It seems to be they're free to do what they want to do. Maybe if they did stuff you didn't like, you might come down on them and come down with some new rules. But on the four corners of what I have in front of me, I can't tell. And it looks like they have pretty plenary control over the music and over the choreography. Even if the government speech threshold wasn't met, which I believe it has been, it still fails because of the nonpublic forum. And in a nonpublic forum, the government can control the event for the purpose for which it's entitled. This is a football game, and it's a halftime show. And in that context, the school doesn't get a right to take over the PA system that's not open to anybody else in order to do what they choose, give their private message. It's a halftime show. The cheerleaders could have involved all of the spectators. I mean, in some interaction, some program. Sure, and let's not – I mean, they could have – the loudspeaker, they're all joining in. For all we know, they could have sung religious hymns, played the music, and had the cheerleader lead them in religious songs. God bless America. Right, and let's not forget – If they were ready to sing it. In this record, the school prayed. Both schools prayed on the 50-yard line before the start of the game. And they had the ability, if they chose to, they could have brought in their own megaphone. They could have asked their fans to come down, not to the field, but to the front seats, participate in the prayer. They could have handed out the prayer, that everybody could say it together. There are a number of ways that they could have done their communal prayer that don't involve the PA system. That was – the whole place was a public forum. There was only one thing that was non-public, and that was the PA system. Yeah, there's nothing – the cheerleaders could have held up signs. It was the PA system that they wanted that was the only thing that was denied to them. Let me ask you a slightly different question on this issue of what speech is government or not. As I understand it from the limited record, commercial speech was allowed. That is to say the PA announcer would deliver a commercial message for commercial interests. I don't know anything more than that. I don't know what kind. I don't know who wrote the script. I don't know whether the script was censored, altered, or rewritten by the PA system. Can I tell any of that from this record? You actually can, and actually – Tell me what I would look to to inform that. It says the announcer will follow the – it's in section – it's in the protocol 3.1.8, which is in the lower court docket 8-1, page 15 of 102, and page 83 of the appendix. It says the announcer will follow the FHSAA script for promotional announcements. You can actually find the script attached to Dr. Deering's affidavit, which was filed in opposition to the motion for preliminary injunction. That's actually before the court. Can I review that on a motion to dismiss for failure to state a claim? In this context, I believe you can, Your Honor. What does that mean, just so I'm clear? In this context, I believe you can. I mean, just because he filed an affidavit doesn't mean that we can just consider any old thing in the record if it's a 12B6. No, no, no. Two, the complaint. Three, conceivably what Judge Schofield has just pointed to, some judicial notice that I might take of not a fact, adjudicative fact, but facts that are self-evidently clear or legal codifications from a legislature, but not generally an affidavit that might be submitted in support. And I don't have really an appeal from the denial of a preliminary injunction here. It's not here, right? This case was dumped on 12B6. Yes. And that's why I'm just raising the question, candidly, whether I could even consider that which really wasn't part of the complaint or the attachments. Yeah, I actually think the argument was in the appellant's brief on that. I don't have the cases in front of me. Yeah, but that doesn't help me any more than if you give it to me. In the context of a First Amendment case, if you can consider things, it's like a little bit. No, I can consider First Amendment facts under Salerno in a very different way as an appellate court than any other kind of fact. But that's not the 12B6 question I was asking you. So the script itself, is it rewritten by the PA guy? I'm Bob's Brewery. I've got a hamburger joint and a bar within a mile of the Citrus Bowl, and I know there's going to be a final game there. And I give him a script saying, Bob's Burgers are the best burgers in town. Get your best brew for a buck apiece, et cetera. And I write out the script. Does the PA announcer just read the script the way I give it to him, or does he redraft it pursuant to some template that he's given by the authorities? And can I tell that from the four corners of the promotion script of the FHSAA? You can tell. I think you can tell from the protocol, and if you're able to look at the script, you can see. Because these are recognizing sponsors, just like the court in MECC were allowing to recognize their sponsors on banners at the school. It's the same kind of thing here. It's thank yous. It's thank you to our partner XYZ. That's completely different. Can you remind me just what was the procedure? And maybe Judge Marcus probably knows. I think he was on the panel. What was the procedural posture in MECC? Was it 12B6 or summary judgment? Do you recall? And if you don't, it's fine. It was summary judgment. I believe it was. It was a full record. That was the difference. Most of these cases are summary judgment. Okay. We believe on this, with what's before the court and the allegations of the complaint, that the district court's decision should be affirmed. Thank you. Thank you. I'd like to make four quick points, if I could. I think part of what we heard just a few moments ago about the message that's provided by the whole school management, and Judge Marcus, I think I better understand the questions that you presented at the opening, so I apologize for that. When you're reading the procedures, I don't know that you get a fully informed explanation of how all this is supposed to go down. But what we do know is that, again, going back to the halftime show, the state did not have control over the loudspeaker. It gave it to a cheerleading coach to play music off of the iPhone, or the smartphone, rather. There was no record evidence to suggest that the state had any idea or any approval of the music, the lyrics, the artist, no sort of prescreening, I guess, if you would. And speaking of prescreening, we don't know exactly how that works under the record. We have argument, slightly, that came up at the hearing, but not record evidence on that. And so when you say things like yes to music, but no to prayer, no to prayer at the outset before anything else is said, that sort of highlights the viewpoint issues that we have. Let me ask you a question, though. Could they have created a, at the outset of the game, that's government speech, we're not letting you say anything, period. That's not what they did here. But if indeed they had said, and their protocol said, we're not turning that microphone over to anybody for any reason, period, whether the message is political, religious, or thanking the fundraisers, all you get at the front end is the Pledge of Allegiance, the National Anthem, period. And yet, they opened the forum up for halftime, and that wasn't purely government speech, so it's something less. It's some kind of limited forum. We're not quite sure what. They could do that, couldn't they, at a football game? I think it depends. Control this mic at the front end and open it up in a limited way for a limited purpose in the middle of the game. They may be able to do that, but it depends, again, on the reason for why they're saying what they're saying at the outset. If we find out through record evidence that ultimately the reason why was to suppress a particular message because we said that we wanted to pray, we have a problem. We have the ability. We know that. We know that from the record already. I mean, we know from what's been attached that they weren't allowing you to give a prayer because they didn't want a prayer and they thought they were going to run afoul of the Establishment Clause. Right. You've already established that. Right. That's easy. The question is if they had said we're borrowing everybody else too, that would be different, but that's not what they said here. Right. It would be different. I think that's true. The underlying reason always matters, of course. Can I just ask one question, too, just to sort of test for what is for me sort of this hazy boundary between content discrimination and viewpoint discrimination but is critically important here if we get through to forum analysis because I think we're in a non-public forum. I think you guys have basically conceded we're in a non-public forum and you say quite rightly even if we are, then it's – viewpoint discrimination is prohibited, which I think you're exactly right about. But so I think the distinction between content and viewpoint sort of matters, and I think maybe it's Cornelius that says viewpoint discrimination obtains when the government has suppressed a message, a particular message on an otherwise includable subject. Right. What is the otherwise includable subject here within which your viewpoint has been suppressed? I think you're correct that it is Cornelius. I think what I've noticed in the case law is that that phrase has over time been dropped off. An otherwise includable subject, I think here if there's a specific – we would have to brief it, to be honest. You're on. And the reason I ask – I'm certainly not trying to like quiz you or test you. The reason I ask is that it seems like it's hard to figure out, to me anyway, where the line is between content and viewpoint because if the response is no prayer, terrified of the Establishment Clause, which seems to be basically what happened here, I can't figure out which side of the line that's on if it's content or viewpoint. Now, if they had said like, are you kidding me? No Christian prayer. You can forget about your Christian prayer. We'll allow people of other faiths to testify – to pray, but not you. Easy peasy, right? But if it's just kind of like no prayer or no politics or no commerce, then that sort of feels content-y to me. I think I better understand your question, and I apologize for that. I think that with the difference between content-based and viewpoint-based, content-based does tend to be particular subjects or persons. With viewpoint-based, it's the standpoint of the position. And we know from the case law that religious expression has been categorized as viewpoint-based, which is even more subject to protections than other types of speech. The whole school announcements, for example, would be other includable subjects, for example. One other point that I'd like to make, too, if you don't mind, very quickly. Judge Marcus, we do agree that the court probably pulled the trigger – not probably, did pull the trigger too fast. And lastly, going back to the whole government speech, which I understand is one of the court's cases, government speech is their defense, and that became abundantly transparent when it wasn't previously really briefed upon or litigated upon. It came up really at the hearing. So to say that it's a threshold issue, perhaps it became one if you're looking past what actually occurred here, which is we made a request to pray, and it was denied for the reasons that we discussed. But that's not something that is part of our case. Sure, I'm sorry. For the reasons that we've discussed and for the reasons that we argued in our briefs, we ask that this court respectfully reverse. Court will be adjourned until 9 o'clock in the morning. Thank you. Thank you.